IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| THE SCHOOL OF THE OZARKS, INC. d/b/a<br>COLLEGE OF THE OZARKS,<br>                        Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services, HILDA SOLIS, Secretary of the United States Department of Labor, TIMOTHY GEITHNER, Secretary of the United States Department of the Treasury,<br>                        Defendants. | )<br>)<br>)<br>)<br>) Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

The School of the Ozarks, Inc. d/b/a College of the Ozarks, by and through its attorneys, states as follows for its claims against defendants:

**Parties**

1.  The School of the Ozarks, Inc. d/b/a College of the Ozarks ("College"), is a four-year liberal arts college located in Point Lookout, Taney County, Missouri, and is widely known for its Work Education Program ("Hard Work U"), where students work campus jobs to help pay for the cost of their education.

2.  In 1906, the Missouri Synod of the Presbyterian Church established The School of the Ozarks, and it was granted a charter by the State of Missouri for the purpose (still faithfully administered) of "provid[ing] the advantages of a christian education for youth of both sexes, especially for those found worthy, but who are without sufficient means to procure such training . . . ."

3. The four-year program of the College began in September 1965.

4. In 2003, the College converted to a not-for-profit corporation governed by Chapter 355 of the Revised Statutes of Missouri, with a stated purpose "To provide the advantages of a Christian education for youth of both sexes, especially for those found worthy, but who are without sufficient means to procure such education. To carry out this purpose, the following aims and objectives have been defined: academic growth, vocational growth, christian growth, patriotic growth and cultural growth."

5. The College is guided by a long-standing biblical worldview which reflects the understanding that human sexuality is a gift from God and that the purpose of this gift includes the procreation of human life and the uniting and strengthening of the marital bond in self-giving love.

6. The College is a member of the Coalition for Christian Colleges and Universities, a national organization of evangelical Christian institutions of higher education, and a member of the Association of Presbyterian Colleges and Universities.

7. Defendants are United States governmental departments and the appointed officials in charge of the respective departments. The individual defendants are sued in their official capacity only.

**Jurisdiction and Venue**

8. This court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a), and 1361 because this action arises under the Constitution and the laws of the United States.

9. This Court has jurisdiction to enter declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. § 702, and to award reasonable attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and 42 U.S.C. § 1988.

2

10. Venue is appropriate in this Court under 28 U.S.C. § 1391(e) because the College is located in this district and a substantial part of the events giving rise to this action occurred in this district.

## General Allegations

### The Affordable Care Act and Preventive Care Mandate

11. In March 2010, Congress passed, and President Obama signed into law, the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152 (March 30, 2010), collectively known as the "Affordable Care Act" ("ACA").

12. The ACA reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act ("PHS Act") relating to group health plans and health insurance issuers in the group and individual markets.

13. Section 2713 of the PHS Act ('the Mandate"), as added by the ACA, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide benefits for certain preventive health services without the imposition of cost sharing. These preventive health services include, with respect to women, preventive care and screening provided for in the comprehensive guidelines supported by the Health Resources and Service Administration ("HRSA") that were issued on August 1, 2011 ("HRSA Guidelines").

14. As relevant here, the HRSA Guidelines require coverage, without cost sharing, for "[a]ll Food and Drug Administration [(FDA)] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," as prescribed by a provider.

3

15. FDA-approved contraceptive methods include birth-control pills; prescription contraceptive devices, including IUDs; levonorgestrel, also known as the "morning-after pill" or "Plan B"; and ulipristal acetate, also known as "Ella" or the "week-after pill"; and other drugs, devices, and procedures.

16. Non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage are required to provide coverage consistent with the HRSA Guidelines, without cost sharing, in plan years beginning on or after August 1, 2012.

### The Narrow and Discretionary "Religious Employer" Exemption

17. On August 1, 2011, defendant governmental departments published an amended regulation providing HRSA with unlimited discretion to establish an exemption for group health plans established or maintained by certain religious employers (and any group health insurance coverage provided in connection with such plans) with respect to any contraceptive services that they would otherwise be required to cover consistent with the HRSA Guidelines. 45 C.F.R. § 147.130(a)(iv)(A).

18. Under the amended regulations, HRSA "may" grant exemptions for a "religious employer" meeting all of the following criteria:

(1) The inculcation of religious values is the purpose of the organization.

(2) The organization primarily employs persons who share the religious tenets of the organization.

(3) The organization serves primarily persons who share the religious tenets of the organization.

4

(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

45 C.F.R. § 147.130(a)(iv)(B).

19. The amended regulation imposes no constraint on HRSA's discretion to grant exemptions to some, all, or none of the organizations meeting the definition of "religious employer."

20. On February 15, 2012, defendants adopted as final, "without change," the Mandate and its narrow "religious employer" exemption. 77 Fed. Reg. 8725, 8727.

### The Temporary Enforcement Safe Harbor

21. On February 10, 2012, defendant HHS issued a "Guidance" describing a "temporary enforcement safe harbor" ("Safe Harbor") from the Mandate. The Safe Harbor applies to "non-exempted, non-grandfathered group health plans established and maintained by non-profit organizations with religious objections to contraceptive coverage (and any health insurance coverage offered in connection with such plans)." Under the Safe Harbor, qualifying organizations will not be subject to enforcement of the Mandate "until the first plan year that begins on or after August 1, 2013," provided they meet certain criteria outlined in the Guidance.

22. The Safe Harbor requires an organization to self-certify that it meets all of the following criteria:

(1) The organization is organized and operates as a non-profit entity.

(2) From February 10, 2012 onward, contraceptive coverage has not been provided at any point by the group health plan established or maintained by the

5

organization, consistent with any applicable State law, because of the religious beliefs of the organization.

(3) The group health plan (or health insurance issuer or third-party administrator) must provide to participants a form notice stating that contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.

23. On March 16, 2012, defendants issued an Advance Notice of Proposed Rulemaking ("ANPRM"). In the ANPRM, defendants announced their intention to create an "accommodation" for non-exempt religious organizations under which defendants would require a health insurance issuer (or third party administrator) to provide the preventive coverage outlined in the Mandate—without cost sharing and without charge—to employees covered under the organization's health plan. The ANPRM solicited public comments on structuring the proposed accommodation, and announced defendants' intention to finalize an accommodation by the end of the Safe Harbor period on August 1, 2013.

24. Nothing in the ANPRM alters the Mandate or its narrow "religious employer" exemption, which were made "final, without change" on February 15, 2012.

25. The ANPRM states, contrary to the explicit language of the Safe Harbor, that the Safe Harbor applies to group health plans sponsored by non-profit organizations that on and after February 10, 2012 do not provide "some or all of the contraceptive coverage otherwise required, consistent with any applicable State law, because of the religious beliefs of the organization (and any group health insurance coverage provided in connection with such plans)."

26. On August 15, 2012, defendant HHS "reissued" its earlier "Guidance" to "clarify" that the Safe Harbor is available to "non-profit organizations with religious objections to some

6

but not all contraceptive coverage, as clarified herein." The new "Guidance" states that the Safe Harbor applies if an organization self-certifies that it meets all of the following criteria:

> (1) The organization is organized and operates as a non-profit entity.
>
> (2) From February 10, 2012 onward, the group health plan established or maintained by the organization has consistently not provided all or the same subset of the contraceptive coverage otherwise required at any point, consistent with any applicable State law, because of the religious beliefs of the organization.
>
> (3) The group health plan (or health insurance issuer or third-party administrator) must provide to participants a form notice stating that some or all contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.

27. Upon information and belief, and as discovery will further substantiate, defendants have sought to evade the authority of the Judicial Branch to review the lawfulness of their actions by juggling the administrative process to give the appearance that this and similar cases and controversies are not ripe for review. Such juggling has yielded mere promises to give relief in the future to plaintiff's current and immediate injuries caused by defendants' actions over the last several months. This case is ripe for review, and such juggling by defendants fails to show the respect due a coordinate Branch of the federal government consistent with the authority of the federal judiciary found in Article III of the U.S. Constitution.

**Application of the ACA and Mandate, the Exemption, and the Safe Harbor to the College**

28. The College provides its employees with a group health insurance plan.

29. The College's employee health insurance plan renews on January 1 of each year.

30. The College's employee health insurance plan does not cover, and has never covered, elective abortion or certain FDA-approved contraceptive drugs such as Plan B and Ella.

31. The College objects to elective abortion, Plan B, and Ella (which it considers abortifacients) on the basis of its religious beliefs, and likewise objects to provision of health insurance for elective abortion and abortifacients, and compelled education or counseling concerning the same, all on the basis of its religious beliefs.

32. Upon information and belief, the College's current employee health insurance plan is considered "grandfathered" under the Mandate.

33. The College will make significant changes to its employee health insurance plan over the next few weeks, and no later than January 1, 2013, resulting in loss of its "grandfathered" status under the Mandate.

34. To implement its employee health insurance plan for the new plan year beginning January 1, 2013, the College will be making insurance coverage decisions and logistical arrangements on or about October 1, 2012, so that the plan can be arranged, reviewed, finalized, and offered to employees for open enrollment this fall in time for the plan year's January 1 start date.

35. The College is required to provide notice of any material modification to its employee health insurance plan at least 60 days before any such material modification takes effect. 77 Fed. Reg. 8677, 8705. Upon information and belief, a change to a self-insured plan or a change that results in loss of grandfathered status constitutes a material modification requiring notification.

36. The College believes it is exempt from the Mandate as a "religious employer" under 45 C.F.R. § 147.130(a)(iv)(B), but, upon information and belief, believes defendants will

8

take the position it is not exempt because, in defendants' view, the inculcation of religious values is not the College's purpose and because it is not a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

37. The College does not qualify for the Safe Harbor because it has provided employee health insurance coverage for contraceptive drugs and devices from February 10, 2012 onward, despite excluding from coverage elective abortions and abortifacient drugs and devices.

38. Even assuming the College could qualify for the temporary relief afforded by the Safe Harbor under the non-binding "clarification" provided by the ANPRM or the non-binding reissued "Guidance," the College still faces immediate and specific injury from civil litigation by employees for failure to provide coverage in accordance with the Mandate.

39. The College is not entitled to protection under the Safe Harbor, nor under defendants' ever-changing interpretations and "clarifications" of the Safe Harbor, given defendants' juggling of the administrative process in an ongoing effort to evade federal court jurisdiction and avoid adjudication of cases ripe for review.

40. The College has more than 50 employees. The College may not avoid the Mandate by simply refusing to offer health insurance to its employees because the Mandate imposes significant financial penalties on entities that decide to provide no health insurance coverage.

41. Although the penalties under the Mandate for refusing to provide health insurance coverage vary, the fine is approximately $2,000 per employee per year.

42. The Mandate also imposes penalties should the College continue to offer health insurance to its employees without complying with the preventive care portion of the Mandate.

9

Case 6:12-cv-03428-SWH   Document 1   Filed 09/17/12   Page 9 of 18

43. Although the penalties under the Mandate for refusing to comply with the preventive care portions of the Mandate vary, the fine is approximately $100 per day per employee.

44. The Mandate exposes the College to substantial fines for refusal to recant its faith or violate its religious beliefs.

45. The Mandate forces the College to provide coverage for or access to coverage for Plan B, Ella, and other abortifacients in violation of the College's religious beliefs, or risk significant financial penalties.

46. In the immediate future, and no later than January 1, 2013, the College will be a non-grandfathered, non-exempt organization subject to the Mandate, unaided by the Safe Harbor. The College will be required to provide insurance coverage in violation of its religious beliefs and teachings or face substantial penalties for violation of the Mandate.

## COUNT I

### Violation of the Religious Freedom Restoration Act
### 42 U.S.C. § 2000bb

47. The College restates and realleges paragraphs 1 through 46 as though fully set forth herein.

48. The College's sincerely held religious beliefs prohibit it from providing coverage for or access to coverage for elective abortion and certain FDA-approved contraceptive drugs such as Plan B and Ella (which it considers abortifacients), and providing related education and counseling in its employee health plan.

49. The College's observance of its sincerely held religious beliefs is the exercise of religion within the meaning of the Religious Freedom Restoration Act.

10

50. The Mandate chills the College's religious exercise by exposing it to substantial fines for its religious beliefs and exercise of those beliefs.

51. The Mandate violates the College's rights under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

52. The College is suffering and will continue to suffer immediate and specific injury absent injunctive and declaratory relief.

## COUNT II

### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

53. The College restates and realleges paragraphs 1 through 52 as though fully set forth herein.

54. The First Amendment's Free Exercise Clause prohibits the government from interference with the free exercise of religion.

55. The College's sincerely held religious beliefs prohibit it from providing coverage for or access to coverage for elective abortions, and certain FDA-approved contraceptive drugs such as Plan B and Ella (which it considers abortifacients), and providing related education and counseling.

56. The College's observance of these sincerely held religious beliefs is the exercise of religion within the meaning of the Free Exercise Clause.

57. The Mandate is not neutral as to religion.

58. The Mandate is not a generally applicable law.

59. Defendants have created categorical exemptions and individualized assessments that relieve some from the Mandate, thus it is not generally applicable or neutral as to religion.

11

60. The Mandate chills the College's religious exercise by exposing the College to substantial fines for its religious beliefs and exercise of those beliefs.

61. The Mandate imposes a burden on the College's religious exercise.

62. The Mandate requires governmental interference with the free exercise of religion by causing the government to make determinations concerning religious teachings, values, views, and events, including (1) whether an organization's "purpose" is the inculcation of religious values, (2) whether an organization "primarily" employs those who share its religious tenets, (3) whether an organization "primarily" serves those who share its religious tenets, and (4) who does and does not "share" the organization's religious tenets.

63. Defendants designed the Mandate, the "religious employer" exemption, and the Safe Harbor in a way that makes it impossible for the College to observe its sincerely held religious beliefs.

64. The Mandate and defendants' enforcement of the Mandate violate the College's rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

65. The College is suffering and will continue to suffer immediate and specific injury absent injunctive and declaratory relief.

## COUNT III

**Violation of the First Amendment to the United States Constitution**
**Establishment Clause**

66. The College restates and realleges paragraphs 1 through 65 as though fully set forth herein.

67. The First Amendment's Establishment Clause prohibits the establishment of any national religion, excessive government entanglement with religion, and the preference by the government of one religion over another.

68. The Mandate violates the Establishment Clause by requiring excessive government entanglement with religion, sincerely held religious beliefs, and doctrinal teachings of religious organizations to determine which religious organizations are required to comply with the Mandate, are exempt as a "religious employer," or are subject to the Safe Harbor.

69. The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employer."

70. Defendants have made the Mandate applicable to some religious organizations but not others, resulting in discrimination among religions.

71. Further, the Mandate creates impermissible distinctions among religions by creating a tiered exemption system of "more religious" and "less religious" organizations, the former of which meet the definition of "religious employer" exempt from the Mandate, and the latter of which do not.

72. The Mandate requires governmental interference with the establishment of religion by causing the government to make determinations concerning religious teachings, values, views, and events, including (1) whether an organization's "purpose" is the inculcation of religious values, (2) whether an organization "primarily" employs those who share its religious tenets, (3) whether an organization "primarily" serves those who share its religious tenets, and (4) who does and does not "share" the organization's religious tenets.

73. The Mandate and defendants' enforcement of the Mandate violate the College's rights under the Establishment Clause.

13

74. The College is suffering and will continue to suffer immediate and specific injury absent injunctive and declaratory relief.

## COUNT IV

### Violation of the First Amendment to the United States Constitution
### Freedom of Speech

75. The College restates and realleges paragraphs 1 through 74 as though fully set forth herein.

76. The Mandate's required provision of insurance coverage for education and counseling concerning elective abortions and abortifacient drugs compels the College to speak in a manner contrary to its religious beliefs.

77. Defendants' actions violate the College's right to be free from compelled speech as secured to it by the First Amendment of the United States Constitution.

78. The College is suffering and will continue to suffer immediate and specific injury absent injunctive and declaratory relief.

## COUNT V

### Violation of the Fifth Amendment to the United States Constitution
### Due Process

79. The College restates and realleges paragraphs 1 through 78 as though fully set forth herein.

80. Because the Mandate infringes upon religious exercise and the right to free speech, the Mandate, and its many and varied exemptions, are vague in violation of the due process rights of the College.

81. Because persons of ordinary intelligence must guess at the meaning, scope, and application of the Mandate, the Mandate, and its many and varied exemptions, are impermissibly

14

vague under the Due Process Clause of the Fifth Amendment to the United States Constitution and should be declared void for vagueness.

## COUNT VI

### Violation of the Administrative Procedure Act

82. The College restates and realleges paragraphs 1 through 81 as though fully set forth herein.

83. Defendants failed to provide proper notice and opportunity for public comment under the Administrative Procedure Act before enacting the Mandate.

84. Defendants' stated reasons that public comments were unnecessary, impractical, and opposed to the public interest are false and insufficient, and do not constitute 'good cause.'

85. Without proper notice and opportunity for public comment, defendants were unable to take into account the full implications of the regulations by completing a meaningful "consideration of the relevant matter presented." Defendants did not adequately consider the voluminous comments they received in opposition to the interim final rule.

86. Therefore, defendants have taken agency action not in observance with procedures required by law, and the College is entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

87. As set forth above, the Mandate violates RFRA and the First and Fifth Amendments.

88. Under 5 U.S.C. § 706(2)(A), the Mandate is contrary to existing law and is in violation of the APA.

89. The College is suffering and will continue to suffer immediate and specific injury absent injunctive and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, The School of the Ozarks, Inc. d/b/a College of the Ozarks, plaintiff, prays the Court enter its judgment granting the following relief:

A. Declare that the Mandate and defendants' enforcement of the Mandate against the College violate the Religious Freedom Restoration Act;

B. Declare that the Mandate and defendants' enforcement of the Mandate against the College violate the First Amendment of the United States Constitution;

C. Declare that the Mandate and defendants' enforcement of the Mandate against the College violate the Fifth Amendment of the United States Constitution;

D. Declare that the Mandate was issued in violation of the Administrative Procedure Act;

E. Issue an order prohibiting and enjoining defendants from enforcing the Mandate against the College on the basis of the College's constitutional right to refuse to provide insurance coverage for elective abortions and abortifacient contraceptives, and right to refuse to provide related education and counseling, all without facing financial penalty from defendants;

F. Award the College the costs of this action and reasonable attorney's fees; and

G. Award such other and further relief as the Court deems just.

HUSCH BLACKWELL LLP


*/s/ Virginia L. Fry*
---
Virginia L. Fry           #28895
Ginger K. Gooch           #50302
Derek A. Ankrom           #63689
901 E. St. Louis Street, Suite 1800
Springfield, Missouri 65806
Telephone: (417) 268-4000
Facsimile: (417) 268-4040
virginia.fry@huschblackwell.com
ginger.gooch@huschblackwell.com
derek.ankrom@huschblackwell.com

**Attorneys for The School of the Ozarks, Inc. d/b/a College of the Ozarks**

17

## VERIFICATION OF COMPLAINT PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing is true and correct to my best knowledge, information, and belief.

*[signature]*
Dr. Jerry C. Davis, President
The School of the Ozarks, Inc. d/b/a
College of the Ozarks